IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| SHERWOOD CRAYTOR,<br><br>              Plaintiff,<br><br>v.<br><br>CTOS, LLC, d/b/a CUSTOM TRUCK ONE SOURCE,<br><br>              Defendant. | Civil Action<br><br>No. 1:20-CV-19875-KMW-MJS<br><br>OPINION |

Kevin M. Costello, Esquire
Jacquelyn Matchett, Esquire
Costello & Mains, P.C.
18000 Horizon Way, Suite 800
Mount Laurel, NJ 08054

*Counsel for Plaintiff Sherwood Craytor*

Scott C. Silverman, Esquire
Ivan R. Novich, Esquire
Littler Mendelson, P.C.
One Newark Center, 8th Floor
Newark, N.J. 07102

*Counsel for Defendant CTOS, LLC d/b/a Custom Truck One Source*

**WILLIAMS, District Judge:**

    **I.   INTRODUCTION**

Plaintiff Sherwood Craytor ("Plaintiff") brings this action against his former employer,

CTOS, LLC d/b/a Custom Truck One Source ("Defendant"), alleging that it discriminated and

1

retaliated against him in violation of the New Jersey Law Against Discrimination (the "NJLAD"), N.J.S.A. §§ 10:5-1, *et seq.*, as well as New Jersey public policy.

Presently before the Court is Defendant's Motion for Summary Judgment brought pursuant to Federal Rule of Civil Procedure 56, which Plaintiff has opposed. For the reasons set forth more fully below, Defendant's Motion is granted, in part, and denied, in part.

## II.  FACTUAL BACKGROUND

This matter arises from Defendant's termination of Plaintiff's employment in June 2020. Plaintiff began his employment with Defendant in August 2017 as an equipment driver. *See* Def.'s Statement of Material Facts ("Def.'s SMF") ¶ 1. Throughout the entire course of his employment, Plaintiff was never disciplined and otherwise satisfactorily fulfilled the requirements of his job. *See* Pl.'s Counterstatement of Material Facts ("Pl.'s CSMF") ¶ 40.

### A. Plaintiff's First Medical Leave

On February 18, 2018, Plaintiff slipped and fell on ice while on the job and landed on his back and head. *See* Def.'s SMF ¶ 5. Plaintiff reported the injury to his supervisor, Bonnie Akridge ("Akridge"), and human resources manager Rita Dube ("Dube"). *See id.* ¶ 6. Though Plaintiff was subsequently diagnosed with a concussion, he was permitted to return to work without restrictions on February 20, 2018. *See id.* ¶ 7.

Less than two months later, on April 13, 2018, Plaintiff underwent a medical evaluation of his back, after which it was determined that Plaintiff would need to undergo lumbar spine surgery. *See id.* ¶ 8. A physician also determined that Plaintiff could not drive, use his arms over his head or below his waist, or lift more than fifteen pounds. *See id.* However, because Defendant did not have any light-duty assignments that Plaintiff could take on, he was subsequently granted a medical leave of absence, effective April 16, 2018. *See id.* ¶ 11.

Plaintiff ultimately underwent surgery in June 2018. *See id.* ¶ 12. During a post-operative evaluation on July 3, 2018, Plaintiff's physician determined that he could not work during his recovery and would require a continued medical leave of absence, with a projected a return-to-work date of October 15, 2018. *See id.* ¶ 14. However, during the course of Plaintiff's recovery, he underwent six separate post-operative evaluations. *See id.* ¶ 15. Each time, Plaintiff's physician determined that he was not yet fit to work and postponed his return-to-work date. *See id.* During this time, Plaintiff received and relied on workers' compensation benefits. *See id.* ¶ 17. Plaintiff was ultimately able to return to work without restriction on February 28, 2019. *See id.* ¶ 18.

### B. Plaintiff's Return and Second Medical Leave

On August 14, 2019—less than six months after Plaintiff returned from his medical leave—Plaintiff suffered a second work-related injury when his work vehicle was struck by another driver from behind. *See* Pl.'s CSMF ¶ 16. Reinjured, Plaintiff was once more required to be out of work for additional medical care and recovery. *See* Def.'s SMF ¶ 26. Although Plaintiff eventually returned to work on September 30, 2019, he subsequently became physically unable to continue working as an equipment driver and was once again placed out of work on December 31, 2019, for additional medical leave. *See id.* ¶¶ 27, 29–30; *see also* Pl.'s CSMF ¶ 19.

Plaintiff's second leave of absence lasted approximately six months, during which time he also obtained and relied on workers' compensation benefits. *See* Pl.'s CSMF ¶¶ 22, 24. As with his first leave of absence, Plaintiff kept in contact with Dube and kept her apprised of his recovery and potential return to work. *See id.* ¶¶ 25–26. In addition, Plaintiff also kept Akridge informed of his recovery and ongoing disability. *See id.* ¶ 27.

### C. **Plaintiff's Termination**

On May 1, 2020, while Plaintiff was still on leave, Defendant made the decision that Plaintiff would be terminated as part of a company-wide reduction in force ("RIF"). *See* Pl.'s CSMF ¶ 43; *see also* Def.'s SMF ¶¶ 37–38.[1] During this time, Defendant's business was actively being impacted by the COVID-19 pandemic, which led to, among other interruptions, reductions in demand, vehicles being returned, stalled projects, and customer cancellations. *See* Def.'s SMF ¶¶ 36–38. Though forty-three employees were initially named in Defendant's roster for potential severance, only six employees were ultimately selected for a first-round layoff; this included Plaintiff. *See id.* ¶¶ 39–40. At that time, Defendant employed three equipment drivers—Plaintiff, John Farley ("Farley"), and Kevin Ryan ("Ryan"). *See id.* ¶ 41. Unlike Plaintiff, it does not appear that Farley or Ryan required any leaves of absence or workers' compensation, and did not otherwise have any actual or suspected disability. *See id.*[2] Of the three drivers, only Plaintiff was selected for termination. *See* Pl.'s CSMF ¶¶ 41–42.

Following Defendant's decision to terminate him, Plaintiff was cleared to return to work on June 3, 2020. *See* Def.'s SMF ¶ 35. However, in the weeks prior to his return, Akridge told Plaintiff several times to "hurry to get back to work" because work was "busy" Pl.'s SMF ¶ 28. This representation was of course inconsistent with the downturn Defendant now claims to have occurred. Although Plaintiff was permitted to return to work as planned, he was terminated days later on June 8, 2020. *See id.* ¶ 47.

---

[1] While Defendant appears to deny that it made the decision to terminate Plaintiff on this specific day, it does not otherwise dispute that such a decision occurred prior to Plaintiff's return while he was still on medical leave.

[2] The Parties do not affirmatively point to anywhere in the record demonstrating that Farley and Ryan were not members of Plaintiff's protected class, but rather simply appear to simply presume it. However, the Court can reasonably infer as much based on Plaintiff's disparate-treatment theory of liability, as well as on the fact that both Farley and Ryan were both working while Plaintiff was on medical leave.

### III.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if— taken as true—it would affect the outcome of the case under governing law."). Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the burden of identifying portions of the record that establish the absence of a genuine issue of material fact. *Id*. (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then "shifts to the nonmoving party to go beyond the pleadings and 'come forward with 'specific facts showing that there is a *genuine issue for trial*.''" *Id*. (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). To survive a motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *See Anderson*, 477 U.S. at 256–57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). When considering a motion for summary judgment, the court views the facts and all reasonable inferences drawn from the facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

## IV. DISCUSSION

Plaintiff's Complaint asserts claims for (1) discriminatory discharge on the basis of an actual or perceived disability in violation of the NJLAD (Counts I and II); (2) retaliatory discharge in violation of public policy for obtaining workers' compensation benefits (Count III); and, (3) a standalone demand for "equitable relief" (Count IV). Defendant's Motion seeks summary judgment as to all Counts. The Court addresses each in turn.

### A. Plaintiff's NJLAD Claim

"The NJLAD was enacted with the express purpose of protecting civil rights, particularly in the area of employment discrimination, where the NJLAD declares that the opportunity to gain employment without fear of discrimination is a civil right." *Thurston v. Cherry Hill Triplex*, 941 F. Supp. 2d 520, 534 (D.N.J. 2008) (citing *Viscik v. Fowler Equip. Co., Inc.*, 800 A.2d 826 (N.J. 2002)). "New Jersey courts construing the NJLAD have repeatedly emphasized the NJLAD's broad remedial nature, mandating that it should be construed liberally." *Id.* at 535. To this end, the NJLAD recognizes a claim for discriminatory discharge, not only for employees who have had a disability at any time, but also for those who are "perceived as or believed to be a person with a disability, whether or not that individual is actually a person with a disability." N.J.A.C. § 13:13-1.3; *see also Grande v. Saint Clare's Health Sys.*, 164 A.3d 1030, 1039 (N.J. 2017) ("[A]n employee who is perceived to have a disability is protected just as someone who actually has a disability.").

Where direct evidence of discrimination is unavailable, an employment litigant, like Plaintiff here, can prove his claim with circumstantial evidence under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Andersen v. Exxon Co., U.S.A.*, 446 A.2d 486, 490 (N.J. 1982). At the first step of the analysis, the plaintiff

6

bears the initial burden of establishing each element of his *prima facie* claim for disability discrimination which, if successfully shown, will create "a presumption [ ] that the employer unlawfully discriminated against [him]." *Clowes v. Terminix Int'l, Inc.*, 538 A.2d 794, 805 (N.J. 1988). The analysis then proceeds to the second step, where the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the plaintiff's termination. *See Gerety v. Atl. City Hilton Casino Resort*, 877 A.2d 1233, 1237 (N.J. 2005). Once the employer provides such a reason, the burden then shifts back to the plaintiff to prove that the employer's proffered reason was "merely pretext for the discrimination." *Id.*

Here, the Parties do not dispute the second stage of the *McDonnel Douglas* analysis (*i.e.*, whether Defendant can articulate a legitimate, non-discriminatory reason for Plaintiff's termination). As such, Defendant's Motion hinges only on Plaintiff's ability to demonstrate (1) a *prima facie* case for discriminatory discharge, and (2) pretext.

### 1. *Plaintiff's Prima Facie Case*

"A plaintiff who relies upon circumstantial evidence to prove unlawful disability discrimination must present *prima facie* evidence of discrimination." *A.D.P. v. ExxonMobil Rsch. & Eng'g Co.*, 54 A.3d 813, 821 (N.J. Super. Ct. App. Div. 2012). To this end, Plaintiff must demonstrate that (1) he was disabled within the meaning of the NJLAD; (2) he was performing his work at a level that met Defendant's legitimate expectations; (3) he was nevertheless terminated; and (4) Defendant had sought another to perform the same work after he was terminated. *See id.*; *see also Grande*, 164 A.3d at 1039.

As a threshold matter, the Court notes that the Parties do not dispute Plaintiff's ability to satisfy the first three prongs of his *prima facie* burden. However, the Parties heavily dispute the fourth prong: whether Plaintiff can show that Defendant sought someone else to perform the same

7

work after he was discharged. To this end, Defendant argues that—because Plaintiff's position was completely eliminated as part of its June 2020 RIF—he cannot demonstrate that Defendant replaced him, and that his *prima facie* claim must fail as a result. Defendant's argument, however, misses the mark.

At the outset, Defendant overlooks the "relaxed" or "modified" *prima facia* standard governing NJLAD claims that arise out of a company-wide RIF, which has long been observed in both this Circuit and in New Jersey state courts. *See, e.g.*, *Marzano v. Computer Sci. Corp. Inc.*, 91 F.3d 497, 503 (3d Cir. 1996) (applying New Jersey law) ("[W]e have held that the fourth prong of the prima facie case should be 'relaxed' when the employee's layoff occurred in the context of a reduction in force."); *Baker v. Nat'l State Bank*, 711 A.2d 917, 928 (N.J. Super. Ct. App. Div. 1998) (adopting Third Circuit's modified *prima facie* standard for RIF-derived discriminatory discharge claims), *aff'd and remanded in part*, 736 A.2d 462 (N.J. 1999). "Where an employer lays off workers and hires no replacements, it would be impossible for a plaintiff ever to satisfy the fourth prong by proving that he or she was replaced" by someone outside of the plaintiff's protected class "or, for that matter, by anyone else." *Brown v. Cnty. of Passaic*, No. A-1607-12T4, 2014 WL 2533768, at *6 (N.J. Super. Ct. App. Div. June 6, 2014). In such a situation, "it obviously is unnecessary for the plaintiff to . . . show that he was actually replaced by someone outside the protected class." *Marzano*, 91 F.3d at 503 (internal quotation marks omitted) (alterations and omissions in original). Thus, for purposes of satisfying the fourth prong of the *prima facie* standard, "it is sufficient [for a plaintiff] to show that he was discharged, while the [employer] retained someone [outside the protected class]." *Id.* (internal quotation marks omitted).[3]

---

[3] Plaintiff's Opposition likewise overlooks the applicable standard. Relying on tangential authorities from New Jersey and the Second Circuit, Plaintiff appears to argue instead that the fourth prong of his *prima facie* burden should effectively be disregarded. This too is incorrect.

8

Here, Defendant retained at least one similarly situated employee who was not actually disabled or perceived to be disabled. As such, Plaintiff instantly satisfies his *prima facie* burden.[4] *See, e.g., Baker*, 711 A.2d at 928 (finding fourth prong satisfied where plaintiff's job functions survived post-RIF and were allocated to non-protected workers).

Defendant also argues that Plaintiff's *prima facie* claim for discrimination fails because he was discharged "as part of a companywide RIF caused by a downturn in business due to Covid-19." Def.'s Br. at 13. But there is nothing particularly striking about the fact that Defendant can advance an independent reason for Plaintiff's termination. Indeed, Defendant bears the burden of articulating such a reason—at the second stage of the *McDonnel Douglas* analysis. *See Zive v. Stanley Roberts, Inc.*, 867 A.2d 1133, 1139 (N.J. 2005) ("[T]he *prima facie* case is to be evaluated solely on the basis of the evidence presented by the plaintiff, irrespective of defendants' efforts to dispute that evidence."). To proffer that reason here does not, as Defendant suggests, dismantle Plaintiff's *prima facie* case, the burden for which is notoriously light. *See Massarsky v. Gen. Motors Corp.*, 706 F.2d 111, 118 (3d Cir. 1983) (describing prima facie case as "easily made out").[5]

---

[4] Defendant also submits that Plaintiff's *prima facie* case fails because he cannot demonstrate that he was discharged "because of" his actual or perceived disability. *See* Def.'s Br. at 13. Here too, Defendant misstates the law. *Compare Bergen Com. Bank v. Sisler*, 723 A.2d 944, 954 (N.J. 1999) (requiring evidence of "direct causal connection" only where "direct evidence" is used to prove employer's discriminatory animus) *with Marzano*, 91 F.3d at 507 (rejecting notion that plaintiffs relying on "circumstantial evidence" are required to adduce "additional evidence" beyond showing that "unprotected employees were retained in their positions") ("[O]ur legal scheme against discrimination would be little more than a toothless tiger if the courts were to require such direct evidence of discrimination."); *see also Thomas v. Princeton Univ.*, No. A-0744-12T2, 2013 WL 2660020, at *7 (N.J. Super. Ct. App. Div. June 14, 2013) (citing *Marzano*) (reiterating that plaintiffs in RIF-related discrimination actions are not "required to produce additional evidence of discrimination" beyond showing that a non-protected employee was retained).

[5] Separately, Defendant repeatedly points to portions of Plaintiff's deposition testimony in which he states that he does not believe that he was discriminated or retaliated against for his disability or workers' compensation claim. Although Defendant argues that these admissions foreclose Plaintiff's *prima facie* case, they do not cite to any law or attempt to square this argument with the burden-shifting framework to which the Court is tethered. Regardless, the Third Circuit has already clarified that admissions like these should be disregarded at the summary judgment stage. *See Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 955 (3d Cir. 1996) ("[I]t is irrelevant whether [plaintiff] believed that [supervisor] did not discriminate against him[.]"). Were summary judgment to be allowed under such circumstances, "the already difficult task of proving discriminatory motive would be made significantly more difficult." *Id.* This is not to say, however, that these admissions are not problematic. To the contrary, they appear to raise legitimate credibility concerns which, although beyond the Court's gaze here, will likely need to be reconciled before a jury.

### 2. *Pretext*

Because the Parties do not dispute Defendant's ability to articulate a legitimate, non-discriminatory reason for Plaintiff's termination, the Court arrives to the third and final stage of the *McDonnel Douglas* framework and considers whether Plaintiff can prove that Defendant's reasons for terminating him were pretextual. In general, a plaintiff establishes pretext by submitting evidence which (1) "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication"; or (2) "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Terry v. Town of Morristown*, 446 F. App'x 457, 461 (3d Cir. 2011) (internal quotation marks omitted). At this stage, plaintiff is not required to produce any additional evidence beyond the prima facie case. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Rather, Plaintiff is expected to uncover "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation that would allow a reasonable factfinder to believe that the employer did not truly act for the asserted reason. *Id.* at 765.

Here, Defendant concedes that Plaintiff adequately performed at a level that met its performance expectations. Defendant also agrees that Plaintiff was never disciplined, reprimanded, or otherwise warned about any issues with his performance. As to why it selected Plaintiff for termination over Ryan and Farley, Defendant explains that it was because they would take initiative to do "extra things," such as "lending a hand in cleaning up the shop" and "taking out the trash." *See* Def.'s SMF ¶ 47.

However, Plaintiff submits that there is reason to disbelieve Defendant. Plaintiff explains that though he may not have done such "extra things" on his own initiative, it was only because

10

they were not part of his job description and that he did not otherwise have reason to believe that it was expected of him. Moreover, Plaintiff maintains that he would clean up the shop every single time that he was asked and that he had never refused to help when asked. Plaintiff also contends that Defendant's selection rationale is dubious because Ryan, unlike Plaintiff, was not only less senior, but also had a disciplinary history. Thus, the difference in treatment, Plaintiff argues, is that Ryan, as well as Farley, were not disabled and continued to work on-site while Plaintiff was on his second extended medical leave of absence. Plaintiff also contends that Defendant's decision to terminate him at a time when his return date was uncertain casts further doubt on the legitimacy of the Defendant's reason to identify him for lay off. Lastly, Plaintiff points to the apparent weakness that the RIF was Defendant's real reason for his termination because Akridge had urged him to return to work quickly because they were "busy." This seems to be in direct contravention of the Defendant's assertion that the decision had already been made to terminate Plaintiff and only him, in his department.

The evidence of pretext Plaintiff points to is by no means overwhelming. However, the Court finds that Plaintiff has proffered just enough evidence demonstrating that there are outstanding issues of material fact which, if accepted by a jury, could ostensibly lead it to question Defendant's motivations or stated reasons for termination. While there is evidence to support Defendant's position that Plaintiff was indeed selected as part of a standard RIF process, Plaintiff's evidence could potentially discount or contradict Defendant's proffered rationale for its selection of Plaintiff.

For these reasons, and for those stated further above, summary judgment as to Plaintiff's claim for disability discrimination is denied.

### B. Retaliatory Discharge

Next, the Court turns to Plaintiff's claim for retaliatory discharge in violation of New Jersey public policy. The New Jersey Workers' Compensation Act (the "NJWCA") makes it unlawful for an employer "to discharge or in any manner discriminate against an employee as to his employment because such employee has claimed or attempted to claim workmen's compensation from such employer." N.J.S.A. § 34:15-39.1. Despite this prohibition, the statute itself does not technically create a private cause of action capable of being litigated in a court of law. However, the New Jersey Supreme Court has long recognized "a common law cause of action for civil redress for a retaliatory firing that is specifically declared unlawful under [the NJWCA]." *Lally v. Copygraphics*, 428 A.2d 1317, 1318 (N.J. 1981).[6] Claims for retaliatory discharge are also analyzed under the three-step *McDonnel Douglas* framework. *See Morris v. Siemens Components*, 928 F. Supp. 486, 493 (D.N.J. 1996) (citing *Lally*, 428 A.2d at 1318).

Here, Defendant's Motion only challenges Plaintiff's retaliation claim at the first step—whether he can establish a *prima facie* claim for retaliation. To succeed on a claim for retaliatory discharge, Plaintiff bears the initial burden of establishing that (1) he made or attempted to make a claim for workers' compensation benefits; and (2) he was discharged for making that claim as a result. *See id.*; *see also Hejda v. Bell Container Corp.*, 160 A.3d 741, 751 (N.J. Super. Ct. App.

---

[6] Defendant argues that Count III is not a common law cause of action, but is instead "truly a claim for retaliation in violation of [the NJWCA]." Def.'s Mot. at 18 n.5. While the legal significance of the distinction Defendant wishes to make is lost on the Court, Defendant in any case has, once more, misstated the law. Plaintiff's claim for retaliatory discharge is a legally distinct, judicially cognizable tort action born out of New Jersey public policy. *See Lally*, 428 A.2d at 1319 (noting that NJWCA administrative remedies for direct statutory violations are "arguably not as complete as a civil action in a court of law"). Were Plaintiff's claim otherwise, then Defendant surely would have never removed it to this Court in the first instance. *See* 28 U.S.C.A. § 1445(c) (prohibiting removal of any "civil action in any State court arising under the workmen's compensation laws of such State"); *see also Milko v. Int'l Flavors & Fragrances, Inc.*, No. 15-8291, 2016 WL 8709998, at *5 (D.N.J. July 29, 2016) (holding that common law retaliatory discharge claim, "which [is] not explicitly provided for in the NJWCA, requires inquiry into fault, and does not depend on the administrative mechanisms or remedies of the NJWCA, and, as such, does not arise under the NJWCA within the meaning of § 1445(c)").

Div. 2017). It is undisputed that Plaintiff engaged in statutorily protected activity when he filed claims for workers' compensation benefits, and thus the first prong of Plaintiff's burden is deemed satisfied. As such, the only question before the Court is whether Plaintiff has adduced sufficient evidence to establish a causal connection between his workers' compensation claims and his termination.

In analyzing a retaliatory discharge claim under New Jersey law, "courts look to correlative federal law to supply the relevant standards for evaluating the claim." *See Morris*, 928 F. Supp. at 493. Federal courts have generally recognized three ways in which a plaintiff may establish causation in retaliation actions. First, a plaintiff may show "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). Second, "a plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period." *Id.* Lastly, a plaintiff may point to the proffered evidence which, when looked at "as a whole," suggests "that the employer had a retaliatory animus when taking the adverse action." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 196 (3d Cir. 2015).[7]

The Court is unable to determine that the time between Plaintiff's claims for workers' compensation and his termination was "unusually suggestive."[8] *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (holding as a matter of law that a "gap of three months between the protected activity and the adverse action, without more, cannot create an inference of

---

[7] Of note, neither Party references or applies any of the three recognized standards for assessing the causal connection between a statutorily protected activity and an adverse employment action.

[8] Although the Parties generally agree that Plaintiff received workers' compensation benefits during his leaves of absence, they do not identify any specific date as to when such claims were first made.

13

causation and defeat summary judgment"); *see also Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (holding that a lapse of over two months between protected activity and adverse employment action "is not so close as to be unduly suggestive" of retaliation). Nor can the Court conclude that Akridge's comments to Plaintiff to "hurry" and "get back to work" while he was on leave were sufficiently "antagonistic" or otherwise constituted a "pattern" of the same. *See LeBlanc v. Thomas Jefferson Univ. Hosps., Inc.*, No. 1:21-CV-12735, 2023 WL 2728804, at *6 (D.N.J. Mar. 31, 2023) ("[A] plaintiff must put forth specific evidence demonstrating that the employer engaged in a series of hostile actions, such as a constant barrage of written and verbal warnings . . . and disciplinary action[s]." (internal quotation marks omitted) (omissions in original)).

However, when considering the entire record as a whole at this stage, the Court finds that Plaintiff can demonstrate, albeit barely, a causal nexus between his workers' compensation claims and his termination. During the relatively short period of time in which Plaintiff was employed with Defendant, he was twice required to take a medical leave of absence to be treated for and recover from rather serious work-related injuries. The first leave of absence lasted approximately nine months; the second was for approximately six months. For each leave period, Plaintiff sought out and relied on workers' compensation. The fact that Defendant chose Plaintiff for termination, while he was still on leave, against two other employees who had never required any leave or workers' compensation—and at least one of whom arguably had a poor work record—may be suggestive of retaliatory animus against Plaintiff. Such a suggestion may be bolstered by the circumstances surrounding Plaintiff's termination, as discussed in Part IV(A)(2), *supra*.

On the other hand, a jury may accept Defendant's evidence and determine that Plaintiff's termination was entirely consistent with a non-retaliatory, company-wide RIF. But based solely on

the circumstantial evidence presented here, the Court cannot say one way or the other, confirming that the issue is best left to a jury. Accordingly, summary judgment as to Plaintiff's retaliatory discharge claim is denied.

### C. Plaintiff's Claim for Equitable Relief

Count IV of Plaintiff's Complaint, despite purporting to assert a standalone claim for "equitable relief," in fact makes various demands for equitable relief including a declaration that Defendant's practices are unlawful; an order against Defendant to "cease and desist" all unlawful conduct; equitable reinstatement, back pay, and front pay; "lost wages, benefits, fringe benefits and other renumeration"; "costs and attorneys' fees"; expungement of personnel records; and any other equitable relief the Court deems "reasonable, appropriate and just." *See* Compl. at 6.

As Defendant correctly points out, "courts within the Third Circuit routinely dismiss stand-alone counts for declaratory and injunctive relief, since such claims are requests for remedies, and not independent causes of action." *Asah v. N.J. Dep't of Educ.*, 330 F. Supp. 3d 975, 1019 n.25 (D.N.J. 2018). However, because Plaintiff concedes that this standalone claim is indeed improper, the Court grants Defendant's Motion as to Count IV.[9]

---

[9] In his Opposition, Plaintiff states that he consents to the "dismissal" of Count IV "so long as it is without prejudice to [his] ability to seek such relief under the remaining counts." Pl.'s Opp. at 12. However, Fed. R. Civ. P. 56 does not enable the Court to "dismiss" any claim, much less without prejudice. Rather, it requires judgment as a matter of law. *Compare* Fed. R. Civ. P. 12(b)(6) *with* Fed. R. Civ. P. 56. However, to be clear, the Court's entry of summary judgment as to Count IV does not preclude Plaintiff from seeking any relief, either in law or in equity, to which he is otherwise entitled under Counts I through III of his Complaint. To the extent Count IV demands a form of relief that is not separately requested in any prior Count, such relief shall be deemed specifically demanded and preserved in advance of trial.

V.  **CONCLUSION**

For all of the reasons articulated above, Defendant's Motion for Summary Judgment is granted, in part, and denied, in part. Specifically, summary judgment is granted with respect to Count IV of Plaintiff's Complaint. The remainder of Defendant's Motion is denied.


Date:   May 30, 2023


*/s/ Karen M. Williams*
KAREN M. WILLIAMS
UNITED STATES DISTRICT JUDGE